## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| JENNIFER DEBUHR and JASON DEBUHR,<br><br>Plaintiffs,<br><br>v.<br><br>WARREN M. HERN, and BOULDER ABORTION CLINIC, P.C., a Colorado professional corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      **Case No.** _____ |

## COMPLAINT

Plaintiffs, Jennifer DeBuhr and Jason DeBuhr, by and through their undersigned counsel, for their Complaint, state and allege as follows:

## PARTIES

1.      Plaintiffs Jennifer DeBuhr and Jason DeBuhr are husband and wife, and at all times material hereto were residents of Auburn, Nemaha County, Nebraska.

2.      Upon information and belief, Defendant Boulder Abortion Clinic, P.C. (the "Boulder Abortion Clinic"), is a Colorado professional corporation that maintains its principal place of business in Boulder, Colorado.

3.      Upon information and belief, Defendant Warren M. Hern ("Dr. Hern") at all times material hereto was a resident of Colorado.

4.      At all times material hereto, Dr. Hern was a physician licensed to practice medicine in the State of Colorado.  Dr. Hern founded the Boulder Abortion Clinic, where he continues to practice as of the time of this filing.  Dr. Hern is the only physician licensed to practice medicine at the Boulder Abortion Clinic.  At all times material hereto, Dr. Hern was working at the Boulder Abortion Clinic and acting within the course and scope of his association

with the Clinic and the negligent acts of Dr. Hern outlined below are imputed to the Boulder

Abortion Clinic.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over this matter under 28 U.S.C. § 1332, as complete

diversity exists between Plaintiffs and Defendants, and the amount in controversy exceeds

$75,000.

6.     Venue is appropriate in the Court under 28 U.S.C. § 1391 because all of the acts

and transactions complained of herein occurred in Boulder, Colorado.

## FACTUAL BACKGROUND

7.     In early 2013, Jennifer and Jason DeBuhr conceived a baby.

8.     Throughout the baby's development, Jennifer and Jason attended prenatal

appointments with Dr. Andrew Robertson at the Methodist Women's Hospital in Elkhorn,

Nebraska to monitor the child's health.

9.     On or about November 18, 2013, Jennifer had an appointment at Nebraska

Medical Center where she underwent an MRI to determine the health and condition of the baby.

At this point, Jennifer was approaching the end of the second trimester in her pregnancy.

10.     On or about November 21, 2013, Jennifer was informed that the results of her

MRI indicated that her baby boy had severe cerebral abnormalities which would reduce the

baby's life expectancy to less than a year, if he survived his delivery.

11.     After difficult conversations with each other and their medical providers, Jennifer

and Jason determined that it was in the best interest of Jennifer's health to terminate the desired

pregnancy.

-2-

12.     At this point in time, Jennifer was nearly in her third trimester and could not have an abortion in her home state of Nebraska.

13.     The DeBuhrs determined that the closest clinic where Jennifer could undergo a late second trimester abortion was the Boulder Abortion Clinic, in Boulder, Colorado.  Dr. Hern is the only physician licensed to practice medicine at the Boulder Abortion Clinic.

14.     Jennifer contacted the Boulder Abortion Clinic, and the clinic staff made her an appointment for her to arrive in Boulder, Colorado on Monday, December 2, 2013. The assistant who talked with Jennifer on the phone informed her that she should expect that her procedure would take at least four days, and that Jennifer would need to make arrangements to stay at a local hotel through December 7, 2013.

15.     Jennifer, Jason, and Jennifer's mother traveled to Boulder, Colorado and checked into the hotel on December 2, 2013.

16.     On the morning of December 3, 2013, Jennifer, Jason, and Jennifer's mother arrived at the Boulder Abortion Clinic.  Upon arrival, Jennifer was told that she would only be permitted to have one person accompany her into the clinic.  This was the first time Jennifer was told that she could only have one person by her side.  The decision was made that Jason would accompany Jennifer into the clinic.

17.     On the morning of December 3, 2013, Jennifer and Jason were required to wire $7,500 to the Boulder Abortion Clinic before the multi-step procedure could begin.  Jennifer then underwent an ultrasound and had blood work done.  The clinic staff gave Jennifer and Jason reading materials and required them to watch an instructional video produced by Dr. Hern's office describing how the procedure would work.  At no point did Dr. Hern or the clinic staff inform or warn Jennifer and Jason of the risks associated with the operation.  At no point did Dr.

-3-

Hern indicate that there was any risk that fetal tissue or bone could be left inside Jennifer after the procedure.

18.     After watching the video, the clinic staff directed Jennifer into a room where she underwent the first step in the procedure.  At this time, Dr. Hern used an ultrasound to find the location of the fetus' heart.  Dr. Hern then inserted a syringe containing medication into Jennifer's belly and into the fetus' heart in order to stop the heart.  The clinic staff then told Jennifer to return to the clinic the next day.

19.     When Jennifer and Jason arrived at the clinic the next day, on December 4, 2013, the clinic staff inserted 1 to 3 laminaria into Jennifer's vagina.  Laminaria are rods of dried kelp which are inserted to help dilate the uterine cervix.  Packing was then placed in her vagina to hold the laminaria in place.

20.     On December 5, 2013, the clinic staff removed the laminaria placed there from the previous day and inserted 6 new laminaria.  Jennifer was then sent back to the hotel with orders to come back the next day to begin the final step in the procedure.

21.     On the morning of December 6, 2013, Jennifer awoke with stomach cramping and discomfort.  Jennifer began vomiting and the packing and laminaria started to fall out of place. Jennifer called the Boulder Abortion Clinic early that morning, and the clinic staff instructed her to show up for her appointment earlier than initially planned.

22.     When Jennifer arrived at the Boulder Abortion Clinic, the clinic staff set up an IV drip and placed a suppository in her rectum.  After several hours, the staff was able to stop the vomiting.

23.     After Jennifer stopped vomiting, the nurses began to prepare Jennifer for the last step in the procedure.  The clinic staff was unable to get Jennifer to dilate to more than one to

two centimeters.  Despite this, Dr. Hern proceeded with a dilation and evacuation ("D&E") procedure of the fetus.

24.     During the D&E procedure, although numbing cream had been placed along her cervix, Jennifer could feel a lot of pulling from the lower half of her body all the way up to her chest.  Jennifer experienced intense pain, and as a result of this pain, at some point during the procedure, she blacked out.

25.     After the procedure, the clinic staff took Jennifer into a post-operating room where her vital signs were checked, and Dr. Hern performed a visual external examination of her body and indicated that the operation was successful.  She was monitored for a couple hours.  Jason was able to visit Jennifer at this time.

26.     After informing Jennifer that she had low levels of iron and that she needed to lose weight, Dr. Hern released Jennifer from the clinic.

27.     Beginning in the early Spring of 2014, Jennifer began to experience breakthrough bleeding.  Thinking it was due to a hormonal imbalance, Jennifer's physician, Dr. Andrew Robertson, changed her birth control twice.  When the bleeding continued, Jennifer was referred to Dr. Mark Carlson, a gynecologist who ordered an ultrasound.

28.     The ultrasound revealed that an object of about four centimeters in length was cutting into Jennifer's uterine wall, causing her to bleed.  Dr. Carlson ordered surgery for the first week of February 2015 to inspect, and if necessary, remove the object.

29.     During the surgery, Dr. Carlson attempted to remove the object, but he was unable to do so.  Dr. Carlson was required to perform a hysterectomy in order to remove the object.

V3.Complaint (00662175-3x9E8FA).docx

30.     The object was tested and it was determined to be a fragment of bone, the shape of which was consistent with the curved portion of a fetus skull.

## FIRST CLAIM FOR RELIEF
### (Medical Malpractice)

31.     Plaintiffs incorporate all the foregoing paragraphs as if fully set forth herein.

32.     In providing medical treatment to Plaintiff Jennifer DeBuhr, Defendant Dr. Hern had a duty to possess and use the care, skill, and knowledge ordinarily possessed and used under like circumstances by other physicians engaged in a similar practice.

33.     Defendant Dr. Hern failed to perform in accordance with that duty and was negligent in one or more of the following respects, which negligence is imputed to the Boulder Abortion Clinic:

    a.  Defendant Dr. Hern proceeded with a late second trimester D&E operation even though he could not get Plaintiff Jennifer DeBuhr to dilate past two centimeters;

    b.  Defendant Dr. Hern failed to undertake sufficient measures to ensure that all fetal material had been cleared from Plaintiff Jennifer DeBuhr's body following the completion of the D&E procedure;

    c.  Defendant Dr. Hern failed to inspect the fetal material removed from Plaintiff Jennifer DeBuhr's body to ensure that all parts were accounted for;

    d.  Defendant Dr. Hern negligently failed to discover an approximately four centimeter fragment of bone which remained in Plaintiff Jennifer DeBuhr's body following the D&E procedure;

e.  Defendant Dr. Hern failed to order or perform appropriate and necessary postoperative medical care and tests to discover a fragment of fetal bone left behind after the D&E procedure, which fragment penetrated Plaintiff Jennifer DeBuhr's uterine wall and led to menorrhagia and ultimately the necessity for Plaintiff to undergo a hysterectomy;

f.  As the licensed physician in charge of the treatment administered to Plaintiff Jennifer DeBuhr, Defendant Dr. Hern failed to exercise the requisite degree of supervision and control over the other personnel and employees of the Boulder Abortion Clinic to insure that they provided adequate and necessary medical care to Plaintiff Jennifer DeBuhr while she was a patient at the Clinic;

g.  Defendants Dr. Hern and the Boulder Abortion Clinic failed to provide Plaintiff Jennifer DeBuhr with the diagnostic, operative and postoperative care and treatment consistent with the applicable standard of care for a physician practicing in Dr. Hern's specialized area of medicine.

34.  As a direct and proximate result of the Defendants' negligence, Plaintiff Jennifer DeBuhr suffered severe and permanent physical and mental injuries as a result of the lack of appropriate or adequate treatment for her medical needs, including but not limited to vaginal bleeding, surgery to remove her uterus, and, severe pain, stress, and anxiety.

35.  As a direct and proximate result of those injuries, Plaintiff Jennifer DeBuhr has suffered damages including permanent injury, disability or impairment to Plaintiff's body; loss of her ability to conceive children; and physical pain and mental suffering endured in the past and reasonably certain to be experienced in the future.

V3.Complaint (00662175-3x9E8FA).docx

36.     As a result of Defendants' breaches, Plaintiff Jennifer DeBuhr has incurred damages in an amount to be proven at trial, in excess of $75,000.00.

Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants on this First Claim for Relief in an amount to be proven at trial, in excess of $75,000.00, plus costs, attorneys' fees, and interest as allowed by law, and for such other and further relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Failure to Warn)

37.     Plaintiffs incorporate all the foregoing paragraphs as if fully set forth herein.

38.     In providing medical treatment to Plaintiff Jennifer DeBuhr, Defendant Dr. Hern had a duty to disclose all medically significant risks associated with the procedure before providing Jennifer with such treatment.

39.     Defendant Dr. Hern, whose negligence is imputed to the Boulder Abortion Clinic, failed to perform in accordance with that duty when, prior to the operation, neither Defendant Hern nor his medical personnel informed Plaintiff Jennifer DeBuhr that there was a risk that parts of the deceased fetus may be left within her body during a D&E operation.

40.     As a direct and proximate result of Defendants' failure to warn Jennifer of this risk, she suffered physical and mental injury including but not limited to vaginal bleeding, the removal of her uterus, and, severe pain, stress, and anxiety.

41.     As a direct and proximate result of those injuries, Plaintiff Jennifer DeBehr has suffered damages including permanent injury, disability or impairment to her body; the loss of her ability to conceive children; and physical pain and mental suffering endured in the past and reasonably certain to be experienced in the future.

42.     As a result of Defendants' breaches, Plaintiff Jennifer DeBuhr has incurred damages in an amount to be proven at trial, in excess of $75,000.00.

Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants on this Second Claim for Relief in an amount to be proven at trial, in excess of $75,000.00, plus costs, attorneys' fees, and interest as allowed by law, and for such other and further relief as the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### (Negligent Misrepresentation)

43.     Plaintiffs incorporate all the foregoing paragraphs as if fully set forth herein.

44.     After the procedure, Defendant Dr. Hern negligently informed Jennifer that the operation had been successful and that she was free to go.

45.     Specifically, Defendant Dr. Hern indicated on Jennifer's clinical record that the products of conception and all the fetal tissue and bone had been removed from her uterus.

46.     These representations were false, as Defendant Dr. Hern and his medical staff failed to remove and account for a four centimeter fragment of bone left in Jennifer's body during the D&E operation.

47.     Relying on Defendant Dr. Hern's representations, Plaintiff Jennifer DeBuhr left Colorado and returned to her home in Nebraska on December 7, 2013. In the Spring of 2014 Plaintiff Jennifer DeBuhr began to experience spotty bleeding.  Relying on Defendant Dr. Hern's post-op representations, Plaintiff Jennifer DeBuhr and her physicians did not expect or anticipate that the bleeding was the result of fetal tissue or bone that Defendant Dr. Hern failed to remove during the operation.

48.     As a direct and proximate result of the false representations negligently made by Defendant Dr. Hern, whose negligence is imputed to the Boulder Abortion Clinic, the bone

V3.Complaint (00662175-3x9E8FA).docx

fragment became lodged in Plaintiff Jennifer DeBuhr's uterine wall, causing physical and mental injury including but not limited to vaginal bleeding, the removal of her uterus, and, severe pain, stress, and anxiety.

49.      As a direct and proximate result of those injuries, Plaintiff Jennifer DeBuhr has suffered damages including permanent injury, disability or impairment to her body; loss of her ability to conceive children; and physical pain and mental suffering endured in the past and reasonably certain to be experienced in the future.

50.      As a result of Defendants' false representations following the procedure, Plaintiff Jennifer DeBuhr has incurred damages in an amount to be proven at trial, in excess of $75,000.00.

Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants on this Third Claim for Relief in an amount to be proven at trial, in excess of $75,000.00 plus costs, attorneys' fees, and interest as allowed by law, and for such other and further relief as the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF
### (Loss of Consortium)

51.      Plaintiffs incorporate all the foregoing paragraphs as if fully set forth herein.

52.      At all times material hereto, Plaintiffs have been husband and wife.

53.      The injuries suffered by Plaintiff Jennifer DeBuhr, resulting from the negligence of Defendants, have adversely affected the ability of Plaintiff Jennifer DeBuhr to provide services and to share affection, companionship, comfort, assistance and relations with Plaintiff Jason DeBuhr.

V3.Complaint (00662175-3x9E8FA).docx

54.   Plaintiff Jason DeBuhr has suffered the following damages as a direct and proximate result of the injuries that Plaintiff Jennifer DeBuhr suffered and continues to suffer as a result of the negligent acts and omissions of Defendants:

    a.   Loss of domestic services; and

    b.   Loss of consortium, including affection, companionship, comfort, assistance, and relations.

WHEREFORE, Plaintiff Jason DeBuhr prays for judgment on the Fourth Claim for Relief against the Defendants for general damages, past and future, for loss of care, companionship, and consortium, mental pain and suffering, the costs of this action, and such other and further relief as allowed by law.


Respectfully submitted on November 30, 2015.

JENNIFER DEBUHR and JASON DEBUHR, Plaintiffs,

*/s/ Kory D. George*
Kory D. George, No. 41058
Laura J. Sova, No. 48151
Woods & Aitken LLP
8055 East Tufts Ave., Suite 525
Denver, Colorado 80237
Phone:    303-606-6700
Fax:    303-606-6701
E-Mail:    kgeorge@woodsaitken.com
    lsova@woodsaitken.com

Attorneys for Plaintiffs.